USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/25/2019_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

JOSE ORTIZ,                                                    :
                                                              :
                              Plaintiff,                       :       **OPINION AND ORDER**
                                                              :
                    -against-                                  :       18-CV-4516 (JLC)
                                                              :
ANDREW M. SAUL,                                                :
Commissioner, Social Security                                 :
Administration,[1]                                            :
                                                              :
                              Defendant.                       :
---------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge**.

Plaintiff Jose Ortiz, whose claim for benefits has been pending for nearly a decade, seeks judicial review of the latest decision by defendant Andrew M. Saul, the Commissioner of the Social Security Administration, denying Ortiz's claim for Supplemental Security Income ("SSI") benefits under the Social Security Act. The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, Ortiz's motion is granted, the Commissioner's cross-motion is denied, and the case is remanded for further administrative proceedings to be completed within 120 days of the date of this Opinion and Order.

---

[1] Andrew M. Saul is now the Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Saul is hereby substituted for former Acting Commissioner Nancy A. Berryhill as the defendant in this action.

# TABLE OF CONTENTS

I.  BACKGROUND ........................................................................................................ 1

A.  Procedural Background ................................................................................. 1

B.  The Administrative Record ........................................................................... 2

  1.  Ortiz's Background ................................................................................ 2

  2.  Relevant Medical Evidence .................................................................. 5

    a)  Pre-Application Records .............................................................. 5

    b)  All Med Health and Rehabilitation ............................................. 6

    c)  Medical Opinions ........................................................................ 10

      (1)  Dr. Henry McCurtis – Examining Psychiatrist .................. 10

      (2)  Dr. John Auricchio – Treating Podiatrist ......................... 14

      (3)  Dr. Arlene Broska – Consultative Psychologist ................ 16

      (4)  Dr. Sharon Revan – Consultative Internist ...................... 17

      (5)  Dr. Jeffrey Rubin – Consultative Psychologist ................ 18

  3.  ALJ Hearings ........................................................................................ 20

    a)  September 22, 2011 Hearing Before ALJ Walters ..................... 20

    b)  November 18, 2015 Hearing Before ALJ Grossman ................. 24

    c)  July 6, 2016 Hearing Before ALJ Grossman ............................. 26

i

II.   DISCUSSION .................................................................................... 29

   A.   Legal Standards ......................................................................... 29

      1.   Judicial Review of Commissioner's Determinations.................... 29

      2.   Commissioner's Determination of Disability ............................. 31

         a)  Five-Step Inquiry ................................................................. 32

         b)  Duty to Develop the Record .................................................. 33

         c)  Treating Physician's Rule .................................................... 35

         d)  Claimant's Credibility ......................................................... 38

   B.   The ALJs' Decisions ..................................................................... 39

      1.   ALJ Walters's October 28, 2011 Decision.................................... 39

      2.   ALJ Grossman's August 29, 2016 Decision.................................. 41

   C.   Analysis ...................................................................................... 46

      1.   The ALJ Did Not Violate the Treating Physician Rule .............. 47

         a)  Dr. McCurtis......................................................................... 47

         b)  Dr. Auricchio........................................................................ 51

      2.   The ALJ Did Not Fully Develop the Record at Step Four .......... 54

         a)  The ALJ Failed to Clarify Dr. Auricchio's Treatment Notes.................... 55

         b)  The ALJ Failed to Request Medical Source Statements From Other Treating Physicians ......................................................................... 59

c) The Record Was Not Sufficiently Comprehensive for the ALJ to Make an RFC Determination at Step Four ................................................................... 62

d) The ALJ Should Obtain Physical Therapy Records ................................... 65

e) The ALJ Should Clarify the Relevant Disability Period ........................... 66

3. The ALJ Should Reexamine His Credibility Evaluation on Remand ......... 66

4. The ALJ Must Resolve Ortiz's Claim Within 120 Days ............................. 67

III. CONCLUSION ................................................................................................. 69

# I. BACKGROUND

## A. Procedural Background

Ortiz filed an application for SSI on March 9, 2010, alleging a disability onset date of November 1, 2003. Administrative Record ("AR"), Dkt. No. 13, at 153–56. Ortiz has since amended the alleged onset date to May 12, 2010. *Id.* at 209. The Social Security Administration denied Ortiz's application on April 14, 2010. *Id.* at 82. Ortiz challenged the denial and appeared before Administrative Law Judge Selwyn S.C. Walters on September 22, 2011. *Id.* at 35–81. In a decision issued on October 28, 2011, ALJ Walters concluded that Ortiz was not eligible for benefits. *Id.* at 19–34. Ortiz filed an action in this Court, seeking judicial review of the ALJ's decision. *Id.* at 568–71. Upon stipulation by the parties, the Court remanded the case for further proceedings on June 12, 2013. *Id.* at 572–74.[2]

In his second administrative round more than two years later, Ortiz appeared before ALJ Seth I. Grossman on November 18, 2015 and July 6, 2016. *Id.* at 460–94, 495–544.[3] In a decision issued on August 29, 2016, ALJ Grossman found Ortiz was not eligible for benefits. *Id.* at 399–433. The ALJ's August 2016 decision

---

[2] Ortiz apparently applied for SSI benefits again on May 2, 2013, a month before the remand order. *Id.* at 403. In any event, this application, which was not part of the administrative record, was consolidated with the initial application. *Id.*

[3] Ortiz appeared before ALJ Grossman on March 9, 2015 and July 14, 2015 as well, but these hearings were both adjourned because Ortiz's claims had not been consolidated onto one ODAR CD, leaving the testifying medical expert without all the exhibits. *Id.* at 436–43, 444–59.

became the Commissioner's final decision on April 16, 2018 when the Appeals Council denied Ortiz's request for review. *Id.* at 380–87.

On May 22, 2018, Ortiz filed the present action, seeking judicial review of the latest ALJ decision. Complaint, Dkt. No. 1. The Commissioner answered Ortiz's complaint by filing the administrative record on October 15, 2018. Dkt. No. 13. On December 14, 2018, Ortiz moved for judgment on the pleadings and submitted a memorandum in support of his motion ("Pl. Mem."). Dkt. Nos. 15–16. On April 5, 2019, the Commissioner cross-moved for judgment on the pleadings and submitted a memorandum in support of his cross-motion ("Def. Mem."). Dkt. Nos. 22–23. Ortiz replied on April 26, 2019 ("Pl. Reply"), Dkt. No. 25, and the Commissioner replied on April 29, 2019 ("Def. Reply"). Dkt. No. 26. On May 8, 2019, the parties consented to my jurisdiction for all purposes under 28 U.S.C. § 636(c). Dkt. No. 27.

## B. The Administrative Record

### 1. Ortiz's Background

Ortiz was born in Puerto Rico on October 5, 1965, and was 44 years old on the amended onset date. AR at 39, 64. He will turn 54 years old this year. Ortiz did not complete high school; his education ended at the eleventh grade. *Id.* at 64. He has been in and out of prison since 1993 with his most recent felony conviction in 2004 for attempted burglary. *Id.* at 47, 266–68.[4] Ortiz served six years in prison

---

[4] The record also contains medical records from Ulster Correctional Facility, indicating that Ortiz was incarcerated from around June 5, 2012 through September 14, 2012, though they are not addressed in the ALJ's opinion. *Id.* at 1612–40.

before he was released on parole on May 12, 2010. *Id.* at 48, 1746. Between his stints in prison, Ortiz worked as a short order cook, waiter, and bus boy. *Id.* at 214. After his most recent release, he reportedly worked off the books as his apartment building's superintendent in exchange for rent, though Ortiz has since denied working at all since the amended onset date. *Id.* at 521, 1350.

Ortiz's partner of 16 years, whom he referred to as his common law wife, passed away while he was in prison. *Id.* at 53, 55, 292–93. A year after his release, Ortiz married another woman who resides in Massachusetts. *Id.* at 958. Due to his parole conditions, which were set to terminate in 2014, he was not permitted to move out of the state of New York to live with her. *Id.* at 958, 1572–73. At the time of the July 6, 2016 hearing, Ortiz reported that he still lived alone in a ground-level apartment in the Bronx. *Id.* at 509–11. Ortiz has a brother and sister who also live in the Bronx and provide him with assistance, such as supporting him financially and doing his laundry. *Id.* at 56, 60, 465. In addition, Ortiz made the acquaintance of a woman from his church who helps prepare his meals and also does his laundry. *Id.* at 474–75. Ortiz testified that he could otherwise manage his own affairs, including bathing, grooming and cleaning himself, cooking his own simple meals, cleaning the apartment, and taking public transportation. *Id.* at 59–62.

Ortiz has an extensive history of polysubstance abuse spanning more than 20 years. *Id.* at 1515. He has primarily abused heroin as well as crack cocaine and marijuana and has admitted to developing an addiction to his pain medication. *Id.* at 956, 1457, 1547. Upon his release from prison, Ortiz was mandated by parole to

undergo substance abuse treatment. *Id.* at 1515. He participated in several programs with varying degrees of success, but he continued to relapse. *Id.* at 926–1009, 1010–81, 1345–1580. At the time of the July 2016 hearing, Ortiz's opioid dependence was being treated by methadone. *Id.* at 517–18.

Ortiz claims he is unable to work due to an ankle injury, hypertension, high cholesterol, asthma, lower back pain, and major depression.[5] *Id.* at 188, 197, 801. Ortiz's ankle impairment stems from an injury he suffered in 2003 when he was running from the police. *Id.* at 43, 499. The injury necessitated surgery by open reduction and internal fixation ("ORIF") of the fractured tibia, which was stabilized by a metal plate and screws. *Id.* at 198, 265. Ortiz complains that since the surgery, he experiences severe pain in his left ankle whenever he is standing or walking for more than "five or ten minutes," though he has declined to undergo another surgery in order to relieve the pain. *Id.* at 507–08. He uses a cane and ankle brace as assistive aids and has been prescribed Percocet, Tramadol, and Endocet, among other pain medications, to alleviate his symptoms. *Id.* at 51–52, 852–59.

Ortiz also takes medication for his other impairments, including Cymbalta for his depression. *Id.* at 53–54, 852–59. There is less documented history of Ortiz's mental health treatment. Ortiz did not testify about his mental impairment during the 2015 and 2016 hearings, and during the 2011 hearing in which he did address

---

[5] Because Ortiz only challenges ALJ Grossman's decision with respect to the ankle and mental impairments, this Opinion and Order will not address these other conditions.

his mental issues, Ortiz only described his symptoms as "pain and anger," "crying and suffering" because of "everything [he] went through" in jail. *Id.* at 53.

## 2. Relevant Medical Evidence

### a) Pre-Application Records

Ortiz reported that he underwent surgery on his left ankle at Bellevue Hospital Center in 2003. *Id.* at 198. The most contemporaneous and detailed record describing the surgery is a 2004 examination report. *Id.* at 265. On May 6, 2004, Ortiz presented to Michael Crook, M.D., at the Albany Medical Center Hospital concerning pain in his left ankle. *Id.* Dr. Crook noted that Ortiz "had [a] fracture of the distal left tibia with internal fixation in the O.R. about one year ago, presently the patient feels a clicking noise and has pain in the left ankle." *Id.* According to Dr. Crook:

> [Anteriorposterior] lateral and oblique views of the left ankle demonstrate the ankle mortise is intact, however there is marked osteoporosis of the bones of the left ankle. The distal fibula and lateral malleolus shows no evidence of fracture. The previous fractures have healed. There is no evidence of dislocation of the talus from the tibia. There is a metallic plate attached to the posterior aspect of the distal tibia with [seven] metallic screws attaching this metallic plate to the tibia. The tibia screws are right angles to the long diameter of the left tibia.

*Id.*[6] Based on this examination, Dr. Crook's impressions included osteoporosis, old healed fracture, and metallic plate with seven screws attached to the distal posterior aspect of the left tibia. *Id.*

---

[6] "Osteoporosis" is defined as "a condition that affects especially older women and is characterized by decrease in bone mass with decreased density and enlargement of bone spaces producing porosity and brittleness." U.S. NATIONAL LIBRARY OF

On October 20, 2009, a Comprehensive Medical Summary Form was
completed at Wallkill Correctional Facility, where Ortiz was incarcerated at the
time. *Id.* at 226–29. Ortiz was diagnosed with hyperlipidemia, mild asthma,
hypertension, ulcers by history, and gastroesophageal reflux ("GERD") by history.
*Id.* Ortiz's behavioral status was observed as appropriate. *Id.* He was also
observed to be ambulatory and capable of living alone. *Id.*

### b) All Med Health and Rehabilitation

From August 2010, months after his prison release, through the date of the
July 2016 hearing, Ortiz presented at All Med Health and Rehabilitation ("All
Med") in the Bronx for his primary care, as well as for his orthopedic and
psychiatric impairments.

Ortiz's first primary care provider at All Med was Jose Martinez, M.D., whom
Ortiz saw at least seven times before the end of 2010. *Id.* at 332–38. Dr. Martinez
ordered an X-ray of Ortiz's ankle, which was completed by Elliott Wein, M.D., on
December 10, 2010. *Id.* at 281. According to Dr. Wein:

> Radiological examination of the left ankle shows this patient to [have]
> a status post open reduction and internal fixation of a fracture of the
> distal shaft of the tibia transfixed by orthopedic plate and screws.
> While the ankle mortise is intact, there is a decrease in the joint space.
> No periosteal elevation, sequestration, demineralization or Brodie's
> abscess formation is noted indicative of osteomyelitis. No lytic or
> blastic lesion is present. The surrounding soft tissues are
> unremarkable.

---

MEDICINE: MEDLINEPLUS, http://c.merriam-
webster.com/medlineplus/osteoporosis (last visited September 25, 2019).

*Id.*[7]  Dr. Wein noted "status post open reduction and internal fixation of a fracture of the distal tibia" but "no acute fracture or dislocation or evidence of osteomyelitis." *Id.*

Ortiz was also treated by podiatrist John Auricchio, D.P.M., beginning on September 1, 2010.  *Id.* at 314.  While Dr. Auricchio's notes are largely illegible, it is evident from the record that Ortiz saw him at least three more times—April 21, 2011, June 30, 2011, and July 30, 2011.  *Id.* at 312, 315, 1768.  Dr. Auricchio prescribed for Ortiz an ankle brace and walker.  *Id.* at 852.  In an undated letter, Dr. Auricchio indicated:

> He presented to my office in severe pain.  He has trouble ambulating and walks with an antalgic gait.  His left ankle has severe limitations of motion.  He cannot Dorsiflex his ankle past 90 degrees.  He also has severe limitations regarding his Midtarsal joint.  He has trouble inverting and everting his left foot.  Radiological examination revealed severe arthritic changes to his left ankle and foot along with surgical hardware.  It is my opinion that Mr. Ortiz may have to undergo further surgery to help alleviate his pain.  However[,] there is still no guarantee of a successful outcome.

*Id.*  at 276.[8]

---

[7] "Osteomyelitis" is defined as "an infectious usually painful inflammatory disease of bone that is often of bacterial origin and may result in death of bone tissue."  U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/osteomyelitis (last visited September 25, 2019).

[8] "Antalgic" is defined as "marked by or being an unnatural position or movement assumed by someone to minimize or alleviate pain or discomfort (as in the leg or back)." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/antalgic (last visited September 25, 2019).

Ortiz was treated most extensively by Michael Pierce, M.D., who saw Ortiz from August 12, 2010 through February 11, 2014, more than monthly at times, for more than 30 appointments. *Id.* at 321–29, 339–41, 874–79, 881–912, 1690–1706, 1710, 1832–35.[9] Upon his first contact with Ortiz on August 12, 2010, Dr. Pierce assessed opioid dependence, status post ORIF crush injury to the left ankle with chronic pain, hypertension, mild anemia, mild persistent asthma, GERD, and hyperlipidemia. *Id.* at 339–41. Dr. Pierce recommended suboxone treatment, Metoprolol and Lisinopril, Advair, Prilosec, and an initial orthopedic consultation. *Id.* Over time, Dr. Pierce prescribed Percocet, Tramadol, Endocet, and Naproxen, among others, for Ortiz's ankle pain. *Id.* at 321–29, 339–41, 874–79, 881–912, 1690–1706, 1710, 1832–35. Throughout his four years of treatment, Dr. Pierce noted that Ortiz was ambulatory, failing to find any gait disturbance or numbness in the extremities. *Id.* Occasionally, however, Dr. Pierce observed decreased range of motion and mild edema in Ortiz's left ankle. *Id.*

In addition, Ortiz was treated by Henry Sardar, D.O., from 2012 to 2013. *Id.* at 915–24, 1603, 1732–42. Upon his first contact with Ortiz on June 4, 2012, Dr. Sardar observed that Ortiz was "able to ambulate independently[, however,] with slow gait and mild difficulty. The patient also is unable to stand on toes and heels. Balance is good[]; however the patient does not require any assistive devices for ambulation." *Id.* at 1603. Nevertheless, Dr. Sardar assessed, among other

---

[9] Occasionally, these appointments were conducted by physician assistant Karyn London, P.A., but ultimately supervised by Dr. Pierce. *Id.*

conditions, gait dysfunction and difficulty ambulating. *Id.* at 1604. During several

visits, Dr. Sardar (or the physician assistant under his supervision) injected Ortiz's

left ankle with Depo-Medrol and lidocaine. *Id.* at 915–24, 1603, 1738–42. Dr.

Sardar also referred him to physical therapy, which he continued to recommend

after Ortiz reported beneficial effects. *Id.* While subsequent examinations revealed

decreased range of motion, mild swelling, and tenderness, Dr. Sardar found no

evidence of muscle atrophy. *Id.* Indeed, on December 3, 2012, John Della Badia,

M.D., conducted an X-ray ordered by Dr. Sardar. *Id.* at 913. Dr. Badia observed

that the metallic left tibial plate and screws were in position, as was the metallic

hardware. *Id.* Dr. Badia opined that no obvious instability could be seen on the

films and recommended clinical correlation and follow-up to monitor. *Id.*

While other All Med providers noted Ortiz's depression and incorporated

conservative treatment for it, Ortiz was specifically seen by psychiatrist Edward

Fruitman, M.D., and his psychiatric team, including physician assistant Nilam

Wadhvania P.A.-C and nurse practitioner Romeeda Mohammed N.P., for mental

health issues. *Id.* 914, 1957–59, 1961–62. While there are only three sets of

progress notes from Dr. Fruitman's team in the record—for February 18, 2014,

October 27, 2014, and February 10, 2015—Dr. Fruitman indicated in a note dated

October 27, 2014, that Ortiz was to be examined on a monthly basis. *Id.* at 925.

Further, in a letter dated February 10, 2015, Dr. Fruitman confirmed that Ortiz

had been receiving care from him and his team since February 2014 and noted

Ortiz's history of opioid dependence and major depression and current prescriptions

of Elevil and Ambien.  *Id.* at 1082.  Dr. Fruitman left blank the question of whether

Ortiz was currently able to work but indicated that any additional requests for

documentation must be specifically directed to his office.  *Id.*

### c)    Medical Opinions

### (1)    Dr. Henry McCurtis – Examining Psychiatrist

On April 4, 2011, psychiatrist Henry McCurtis, M.D., of New Beginnings

Counseling Center at Narco Freedom, Inc., conducted an initial evaluation of Ortiz.

*Id.* at 211 n.2, 270.  That same day, Dr. McCurtis completed four assessment forms.

*Id.* at 270–71; 272–74; 283–90; 292–93.

In a Psychiatric Assessment form, Dr. McCurtis described Ortiz as having

"major depression and generalized anxiety in the context of a traumatic

developmental history as the child of a physically abusive alcoholic.  He now has a

chronic pain [secondary to a] traumatic break of his [left] ankle in 2002."  *Id.* at 270.

Dr. McCurtis observed on mental status examination that Ortiz "is a sad tearful

man who relates his story without exaggeration.  He expresses a sense of loss both

for early attachment and the death of a significant other of 16 [years] due to heart

attack 2 years ago.  This is combined with his loss of mobility and chronic pain

[secondary to] his [left] leg/ankle."  *Id.*  Dr. McCurtis assessed major depression,

generalized anxiety and chronic pain on Axis I, Cluster C/B on Axis II,

hypertension, asthma, GERD and weight loss on Axis III, psychological, physical,

housing, and financial conditions on Axis IV, and a GAF score of 51–60 on Axis V.

*Id.* at 271.[10]  Dr. McCurtis indicated that Ortiz's prognosis was "guarded" and remarked that Ortiz "has a complex combination of chronic pain and psychological pain that requires coordination of pain management[,] psychotherapy and pharmacology."  *Id.*

In a Medical Assessment of Ability to Do Work-Related Activities (Mental) form, Dr. McCurtis assessed that Ortiz had fair abilities to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, function independently, and maintain attention and concentration.  *Id.* at 272. Ortiz's ability to deal with work stressors was marked poor.  *Id.*  Dr. McCurtis further described Ortiz as having fair abilities to understand, remember and carry out simple, detailed and complex job instructions.  *Id.* at 273.  Ortiz's abilities to behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability were also deemed fair, while his ability to maintain personal appearance was considered good.  *Id.*

In a Multiple Impairment Questionnaire form, Dr. McCurtis identified the following positive clinical findings in support of his diagnoses: weight loss, decrease

---

[10] "The GAF is 'a scale that indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning,' and runs from 0 to 100." *Maldonado v. Berryhill*, No. 16-CV-165 (JLC), 2017 WL 946329, at *8 n.21 (S.D.N.Y. Mar. 10, 2017) (quoting *Petrie*, 412 F. App'x at 406.  "A score of 41–50 indicates serious symptoms, a score of 51–60 indicates moderate symptoms and a score of 61–70 indicates some mild symptoms or some difficulty in social or occupational functioning . . . ."  *Cabrera v. Berryhill*, No. 16-CV-4311 (AT) (JLC), 2017 WL 3172964, at *3 (S.D.N.Y. July 25, 2017), *adopted by*, 2017 WL 3686760 (S.D.N.Y. Aug. 25, 2017) (citing *Maldonado v. Colvin*, No. 15-CV-4016 (HBP), 2017 WL 775829, at *5 (S.D.N.Y. Feb. 28, 2017)).

in appetite, poor sleep patterns, decrease in energy, sadness with worry, and daily crying. *Id.* at 283–84. Dr. McCurtis assessed that Ortiz could only sit for up to three hours and stand or walk for less than one hour in an eight-hour work day. *Id.* at 285. Dr. McCurtis further opined that Ortiz should not stand or walk continuously in a work setting. *Id.* at 286. Dr. McCurtis indicated that Ortiz could only lift and carry less than five pounds occasionally, that he had significant limitations in doing repetitive reaching, handling, fingering or lifting because the pain in his leg would swell, and that he had marked limitations in both his upper extremities. *Id.* at 286–87. Dr. McCurtis described Ortiz's treatment to include "monthly psychiatric visits" and "weekly therapeutic visits." *Id.* at 287. Dr. McCurtis opined that Ortiz's symptoms would likely increase if he was placed in a competitive work environment and that they were severe enough to interfere with his attention and concentration "constantly." *Id.* at 287–88. Dr. McCurtis also considered Ortiz's impairments ongoing and expected that they would last at least 12 months. *Id.* at 288. Dr. McCurtis indicated that Ortiz was incapable of tolerating even low stress because of his "inability to focus." *Id.* Dr. McCurtis believed Ortiz would need to take unscheduled breaks as long as 30 minutes to one hour as often as every hour or less. *Id.* He also opined that Ortiz's impairments were likely to produce "good days" and "bad days" and that Ortiz would likely be absent from work more than three times a month. *Id.* at 289. Dr. McCurtis left blank whether Ortiz was a malingerer. *Id.* at 288.

In a Psychiatric Evaluation form, Dr. McCurtis observed the following:

> [Ortiz had a] pained look on his face but very cooperative and coherent as he described the vicissitudes of his life[, i.e.,] separation from [his] mother [at] age 6, alcoholic father who was physically abusive who beat him when he was 5 years old. He was homeless by age 16 and by 24 in prison. He remained in prison almost continuously from 1989-2010 except 1998, 1999, and 2000. He denies suicidal ideations at present but describes several prior attempts [at] age 30 and 2"2 (sic) years in throws of grief after his wife dead of a [heart attack]. He describes a 16[-]year relationship that repaired the pain of his separation from his mother. He cries over her daily.

*Id.* at 292–93.

On May 23, 2011, at Ortiz's second visit, McCurtis completed a Psychiatric/Psychological Impairment Questionnaire form. *Id.* at 295–302. Dr. McCurtis assessed that Ortiz was markedly limited in his abilities to remember locations and work-like procedures; to understand, remember, and carry out one or two step instructions; to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule; to maintain regular attendance; to be punctual within customary tolerance; to sustain ordinary routine without supervision; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately changes in the work setting. *Id.* at 297–300. Ortiz was considered only moderately limited in his abilities to make simple work-related decisions; to complete a normal workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to ask simple questions or request assistance; to get along with co-workers or peers

without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior; to adhere to basic standards of neatness and cleanliness; and to be aware of normal hazards and take appropriate precautions. *Id.* His only mild limitations concerned his abilities to travel to unfamiliar places or use public transportation and to set realistic goals or make plans independently. *Id.* Dr. McCurtis further indicated that Ortiz experienced episodes of deterioration or decompensation, explaining that "[t]he combination of chronic pain and recurrent depression has a severe and persistent impairment on his social and vocational capacity." *Id.* at 300.

No treatment notes were provided by Dr. McCurtis, particularly with respect to the "monthly psychiatric visits" or the "weekly therapeutic visits."

### (2) Dr. John Auricchio – Treating Podiatrist

On October 6, 2011, podiatrist John Auricchio, D.P.M., completed a Lower Extremities Impairment Questionnaire form. *Id.* at 372–79. Dr. Auricchio diagnosed equinus, arthritis, and severe limitation of motion and arrived at a guarded prognosis. *Id.* at 372.[11] Citing a physical exam and X-ray, Dr. Auricchio

---

[11] "Equinus" is defined as "a congenital deformity of the foot in which the sole is permanently flexed so that walking is done on the toes without touching the heel to the ground." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/talipis+equinus (last visited September 25, 2019).

"Crepitus" is defined as "a grating or crackling sound or sensation (as that produced by the fractured ends of a bone moving against each other or as that in tissues." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/crepitation (last visited September 25, 2019).

identified the following positive clinical findings in support of his diagnoses: limited range of motion, tenderness, muscle atrophy, muscle weakness, swelling, joint deformity, abnormal gait, crepitus, antalgic gain, and pain with walking. *Id.* at 372–73. Ortiz's symptoms included difficulty walking and standing as well as pain, which was described as "sharp/dull;" experienced constantly; and precipitated by trauma. *Id.* at 374. While Dr. Auricchio observed that Ortiz had the ability to independently initiate ambulation, sustain ambulation, and complete ambulatory activity, he opined that pain would interfere with Ortiz's ability to ambulate effectively. *Id.* at 374–75. Dr. Auricchio indicated that despite needing a cane, Ortiz was able to carry out activities of daily living without assistance, including traveling to and from his home and appointments and preparing meals. *Id.* at 375.

Dr. Auricchio assessed that Ortiz could only sit for three hours and stand or walk for one hour in an eight-hour work day. *Id.* He wrote "n/a" under the assessment of Ortiz's abilities to lift and carry but noted that Ortiz could not push, pull, kneel, or bend. *Id.* at 376, 378. Dr. Auricchio opined that Ortiz's experience of symptoms were never severe enough to interfere with his attention and concentration but that his impairments were ongoing and expected to last at least 12 months. *Id.* at 377. He denied that emotional factors contributed to the severity of Ortiz's symptoms and functional limitations and that he was a malingerer. *Id.* Dr. Auricchio opined that Ortiz was capable of tolerating low stress but could not determine whether Ortiz needed to take unscheduled breaks. *Id.* He also opined

that Ortiz's impairments were likely to produce "good days" and "bad days" but could not determine how often Ortiz would likely be absent from work. *Id.* at 378.

### (3)   Dr. Arlene Broska – Consultative Psychologist

On July 24, 2013, Arlene Broska, Ph. D., conducted a psychiatric evaluation of Ortiz. *Id.* at 1745–49. According to Dr. Broska:

> Vocationally, there is no evidence of limitation in the claimant's ability to follow and understand simple directions and instructions, perform simple or complex tasks independently, maintain attention and concentration, or maintain a regular schedule. There is evidence for mild to moderate limitation in his ability to learn new tasks and make appropriate decisions. There is evidence for mild limitation in his ability to appropriately deal with stress. There is no evidence of limitation in his ability to relate adequately with others. The results of the exam appear to be consistent with psychiatric problems and a history of substance abuse, but in itself, this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis.

*Id.* at 1748–49.

Dr. Broska assessed adjustment order with depressed mood and history of heroin abuse on Axis I, antisocial traits on Axis II, and high blood pressure, asthma, ankle problem, and hearing problem on Axis III. *Id.* at 1748. Dr. Broska recommended continuation with mental health and substance abuse treatment and concluded with a guarded prognosis. *Id.* In closing, Dr. Broska noted that Ortiz "may need assistance to manage funds due to concern he would use the money to procure drugs." *Id.*

### (4)    Dr. Sharon Revan – Consultative Internist

On July 24, 2013, Sharon Revan, M.D., completed an internal medicine examination of Ortiz. *Id.* at 1750–54. Dr. Revan recounted his activities of daily living:

> He showers and dresses himself, but holds on because he loses his balance with his left foot. He does not do any cooking, cleaning, laundry, and shopping because of his left foot pain. He watches TV, listens to the radio, reads, and follows up with his doctor.

*Id.* at 1751. Upon physical examination, Dr. Revan made the following observations:

> He appears in no acute distress. He limps on the left. He is unable to walk on heels and toes. He squats fully. Stance normal. He has a cane, given by a doctor. He uses it all of the time for support. It is needed. Needs no help changing for exam or getting on and off exam table. Able to rise from chair without difficulty.

*Id.* at 1751–52. Dr. Revan's musculoskeletal review noted, *inter alia*, edema of the left ankle and its range of motion was with pain. *Id.* at 1752. Nevertheless, Dr. Revan observed "[n]o evidence subluxations, contractures, ankylosis, or thickening. Joints stable and nontender. No redness, heat, or effusion." *Id.*[12] Dr. Revan's

---

[12] "Subluxation" is defined as "partial dislocation (as of one of the bones in a joint)." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/subluxation (last visited September 25, 2019).

"Contracture" is defined as "a permanent shortening (as of muscle, tendon, or scar tissue) producing deformity or distortion." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/contracture (last visited September 25, 2019).

"Ankylosis" is defined as "stiffness or fixation of a joint by disease or surgery." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/ankylosis (last visited September 25, 2019).

neurological review noted no sensory deficit and "5/5" strength in the upper and lower extremities. *Id.* at 1753. Dr. Revan found no evidence of muscle atrophy in the extremities. *Id.* While Ortiz's prognosis was fair, Dr. Revan concluded:

> In my opinion, the claimant has no limitations with his speech, vision, or hearing. There are no limitations with the upper extremities for fine and gross motor activity. There are mild limitations with walking, standing, and climbing stairs, due to left ankle pain. No limitations with sitting and lying down. There are mild to moderate limitations with personal grooming and activities of daily living, secondary to left ankle pain.

*Id.*

### (5) Dr. Jeffrey Rubin – Consultative Psychologist

On October 16, 2014, Jeffrey I. Rubin, Ph. D., conducted a psychological examination of Ortiz. *Id.* at 1884–88. Dr. Rubin indicated his evaluation was based on a clinical interview with mental status examination, symptom checklist, GAF assessment, and review of Dr. McCurtis's assessments only. *Id.* at 1884.

Dr. Rubin observed, among other things, the following:

> Overall, he answered questions willingly, and to the best of his ability. His attention and concentration for the interview examination was adequate. His speech was somewhat pressured and with decreased volume. Mr. Ortiz spoke spontaneously; his stream of speech was consistent with clinically significant depression as well as significant ruminations/worry. He could answer only simple, direct concrete questions effectively. Mr. Ortiz impresses as sincere and forthright in his presentation. He described that he is so desperate for some type of financial and situational help that he has purposely started having unprotected intercourse with a woman who is HIV positive, because she has told him that he would very quickly get assistance with housing and living expenses if he was to be tested positive for HIV.

*Id.* at 1885–86.

Dr. Rubin concluded that "Mr. Ortiz is presently suffering a [m]oderate-to-[m]arked psychological/psychiatric disability. Based on his history, my examination, and a review of historical records, he has [m]ajor [d]epressive [d]isorder—[m]oderate, and his functioning is permanently impaired by depression (prominent) with anxiety." *Id.* at 1888. Dr. Rubin recommended ongoing psychotherapy and psychotropic medications "to afford progress towards psychiatric and psychological stability." *Id.*

That same day, Dr. Rubin completed a Mental Impairment Questionnaire form. *Id.* at 1890–94. Dr. Rubin opined that Ortiz was markedly limited in the following abilities: to understand and remember detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule and consistently be punctual; to sustain ordinary routine without supervision; to work in coordination with or near others without being distracted by them; to complete a workday without interruptions form psychological symptoms; to perform at a consistent pace without rest periods of unreasonable length or frequency; to interact appropriately with the public; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to workplace changes. *Id.* at 1893. Ortiz's abilities to remember locations and work-like procedures and to carry out detailed instructions were deemed moderate-to-marked. *Id.* Ortiz was considered moderately limited in the following abilities: to understand and remember one to two step instructions; to carry out simple, one to two step instructions; to make simple work-related decisions; to get along with

19

coworkers or peers without distracting them; to maintain socially appropriate behavior; to adhere to basic standards of neatness; to be aware of hazards and take appropriate precautions; and to travel to unfamiliar places or use public transportation. *Id.* Dr. Rubin found Ortiz to have no or mild limitations in his abilities to ask simple questions or request assistance, to set realistic goals, and to make plans independently. *Id.*

### 3. ALJ Hearings

#### a) September 22, 2011 Hearing Before ALJ Walters

Represented by counsel, Ortiz appeared before ALJ Walters in the Bronx on September 22, 2011. *Id.* at 37. Testimony was taken from Ortiz and vocational expert Raymond Sesta. *Id.* at 36. Ortiz testified that he was 45 years old at the time, married without children, and living alone in a room on the basement floor of an apartment building. *Id.* at 39–41. Ortiz indicated that he took public transportation to the hearing. *Id.* at 42. Ortiz testified that he could not work because he has "a lot of metal in [his] ankle. . . . Seven [screws], and a [metal] rod. . . . I got a rod all the way from my ankle . . . to my shin." *Id.* at 42–43. He was currently undergoing physical therapy and being treated by Dr. Auricchio "[o]nce a month" since 2010. *Id.* at 43–44. Ortiz complained that he had been experiencing severe pain since the accident in 2003. *Id.* at 44–45. He explained that he usually sits with his left leg elevated because "[i]t's always swollen" and that he has different shoe sizes, presumably also because of the swelling. *Id.* at 69–70.

Ortiz indicated that Dr. Pierce had prescribed him Percocet, which "helped for a while but then . . . the medication stopped working." *Id.* at 46–47. Ortiz claimed his dosage was reduced "[b]ecause I'm on parole and parole states that I can't be taking this much medication . . . ." *Id.* at 47. Ortiz explained that he was on parole for attempted burglary. *Id.* When asked about his pain intensity on a scale from zero to ten, Ortiz described that "[s]ometimes it's eight, nine, then when it's painful, a [ten]," and after taking medication, "it ease[s] for a while . . . [l]ike six." *Id.* at 49. Ortiz testified that his doctors were exploring the possibility of surgery to attempt to relieve the pain in his left ankle. *Id.* at 51. The ALJ observed that Ortiz had a cane with him at the hearing. *Id.* Ortiz stated that he also had an ankle support as well as a brace and was currently waiting for customized shoes to accommodate the brace. *Id.* at 51–52.

The ALJ then asked Ortiz about the mental impairment with which he claimed to be diagnosed in 2003. *Id.* at 52. When asked about his symptoms, Ortiz explained: "I was getting mad for no reason. I started throwing stuff around the house. . . . I suffered through, my wife passed away while I was incarcerated. I can't sleep with the pain . . . All the stuff I went through in jail, the abuse and for eight years you know. Getting hit by the correctional officers." *Id.* at 53. When the ALJ narrowed the scope of his question to symptoms Ortiz experienced since the amended onset date, Ortiz responded: "I have a lot of pain and anger . . . I can't sleep at night . . . ." *Id.* Ortiz explained that Dr. McCurtis had prescribed him Cymbalta, which he had been taking for about five to six months. *Id.* at 53–54. Dr.

McCurtis increased his dosage because he "couldn't sleep, or I'd wake up crying and crying and suffering, you know everything I went through." Ortiz testified that the medication "calms my nerves." *Id.*

Ortiz indicated he was able to run errands but would need assistance if he had to carry something heavy or push a shopping cart. *Id.* at 56. He testified, however, that all of his impairments affected his daily life: "I can't really do nothing. I can't work, you know, something I always wanted to do." *Id.* at 59. Ortiz explained he could only heat up soup and microwavable meals. He reported that he could not do the dishes but instead bought paper plates and discarded them after use. *Id.* at 59–60. Ortiz reported that he also did not do the laundry, a task that his brother helped with "because they got [a] washing machine" at his house. *Id.* at 60. Ortiz reported being able to make his bed, sweep and mop the floor, take out the garbage, use a cell phone, as well as dress and groom himself. *Id.* at 60–61. But "[i]f I'm in a lot of pain, I won't do it." *Id.* at 68.

Ortiz testified that, on average, he could sit for up to 30 minutes before having to get up and he could stand for up to ten minutes before having to sit down. *Id.* at 62–63. Ortiz explained that this was "[b]ecause sometimes I'm standing up and I got to sit down quick and start massaging [my ankle] because the pain, the throbbing shoots up, so I have to massage it to ease the pain." *Id.* at 63. Ortiz estimated that he was able to walk about a block and a half and lift, but not carry, about ten to fifteen pounds. *Id.*

Ortiz testified that he was currently receiving food stamps though he does not receive cash assistance or any other income. Ortiz testified that he had worked as a stocker in a supermarket in 1995. *Id.* at 63–64. Prior to his most recent incarceration, in 2001 and 2002, Ortiz was employed by a temp agency through which he worked as a short order cook, waiter, and bus boy. *Id.* at 64–65. When asked why he could not return to such past work, Ortiz responded his ankle prevented him from doing so. *Id.* at 65–66. When asked if he could do work if he was sitting, Ortiz responded: "I can't sit that long either." *Id.* at 66. Ortiz testified that "the longest job I done maybe was three or four months. I think that's the longest. I don't think I lasted a year at any job." *Id.* at 67. When asked if he attempted to work at all since the amended onset date, Ortiz described being paid twenty dollars by the super for putting up flyers in the apartment building. *Id.* at 70–71.

Sesta opined that a hypothetical individual of Ortiz's age, education, and work experience and a residual capacity to perform the full range of exertion activities, but could only sit for up to three hours and stand and walk for up to one hour in an eight-hour day, could not perform Ortiz's past work as a short order cook, bus boy, or waiter. *Id.* at 73–74. Nor was there any unskilled occupation existing in the national economy that such an individual could perform. *Id.* at 74. Modifying, however, the residual capacity to perform sedentary work, Sesta opined that such an individual could be employed as an order clerk, assembler, or clerical worker. *Id.*

at 75–76.[13]  He added that this individual could perform the three jobs cited even if he required a hand-held assistive device or if he had to alternate between sitting and standing positions for three minutes every two hours.  *Id.* at 76–77.

### b)    November 18, 2015 Hearing Before ALJ Grossman

Represented by counsel, Ortiz appeared before ALJ Grossman in the Bronx on November 18, 2015.  *Id.* at 462.  Testimony was taken from Ortiz, vocational expert Christine DiTrinco, and medical expert and retired orthopedic surgeon Ronald Kendrick, M.D.  *Id.* at 461, 850–51, 670.

Ortiz maintained that he was incapable of working because "[his] leg[] keeps getting worse. . . . [It is] shattered."  *Id.* at 467–68.  Ortiz testified that he could only walk for about half a block before having to stop and rest and that he could only stand for about ten minutes.  *Id.* at 470.  Ortiz indicated that he also could not sit for prolonged periods, presumably because of his back pain.  *Id.* at 471.  Ortiz indicated he could carry and lift about ten pounds.  *Id.* at 472.  Ortiz testified that he had been using a cane every day since the surgery in 2003.  *Id.*  Ortiz reported that he had been taking Morphine before switching to Percocet and other medication to keep down the swelling of his ankle.  *Id.* at 472–73.  However, he indicated that the medication is no longer effective in relieving his pain.  *Id.* at 473.

---

[13] *See* 20 C.F.R. 416.967(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.").

Dr. Kendrick opined that Ortiz's ankle impairment should not prevent him from standing for most of a workday and that he should be able to do the full range of light work. *Id.* at 479–80.[14] Dr. Kendrick noted that not all treatment notes in the record documented swelling of the ankle and that there was no objective evidence for Ortiz's need to use a cane. *Id.* at 480–81. While Dr. Kendrick found no evidence of muscle atrophy, he acknowledged evidence of an abnormal gait or difficulty walking: "Well, yeah, various examiners have described a limp. . . . [B]ut you know, people can walk with a little limp and do quite well." *Id.* a 482–83. While acknowledging that limited range of motion and edema could potentially cause a person pain if they are on their feet, Dr. Kendrick indicated that it would be helpful for Ortiz to sit for a while after he stood for a period because it would relieve any stress on his ankle that might have accumulated during the time he was standing. *Id.* at 483–84.

The ALJ asked DiTrinco whether any jobs existed for a hypothetical person who could do the full range of light work, except the work must be a simple-task instruction job and the person must have the option to sit for ten minutes after standing for 15 minutes. *Id.* at 486. DiTrinco cited employment as a furniture

---

[14] *See* 20 C.F.R. 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.").

rental consultant, inspector/hand packager, and final inspector. *Id.* at 486–87.

DiTrinco confirmed that the hypothetical person could still do these jobs and be off

task no more than ten percent of the time and absent no more than once per month.

*Id.* at 487. However, if the hypothetical person also required a cane, then no jobs

were available. *Id.* at 489. DiTrinco indicated that the furniture rental consultant

would have more than occasional contact with the public, while the other two jobs

would not. *Id.* at 490. When asked to provide one other job which fits the

hypothetical without the need for a cane but has no more than occasional contact,

DiTrinco cited employment as a marker. *Id.* DiTrinco confirmed that if the need for

a cane was combined with occasional contact with coworkers, supervisors, and the

public, there would be no light work available. *Id.* at 491.

No testimony was elicited regarding Ortiz's mental impairment.

### c)     July 6, 2016 Hearing Before ALJ Grossman

Ortiz appeared before ALJ Grossman again on July 6, 2016, because more

evidence was offered into the record. *Id.* at 501. Testimony was taken from Ortiz,

Dr. Kendrick, and vocational expert David Festa. *Id.* at 496.

Ortiz reiterated that he still was not capable of working: "I can't, not with

this pain. Too much pain just in standing. I can't stand that long. . . . I can't stand

no more than ten minutes [], because my leg gives up on me. . . . I have a lot of

metal and titanium in my left ankle." *Id.* at 503. Ortiz indicated that he took a taxi

to get to the hearing. *Id.* Ortiz maintained that he could only walk as far as half a

block and as long as five or ten minutes, after which "I've got to sit down, because

my legs starts shaking. . . And I lose a lot of balance, I've been – lately, I've been losing too much balance and falling and falling, also." *Id.* 507. Ortiz explained that while he had not been to the emergency room as a result of a fall, he did get bruises. Ortiz denied reporting to others that he was working. *Id.*

Ortiz testified that he postponed the second surgery that was being considered in 2011 because of the pain (*id.* at 507–08) yet later indicated that he would rather his foot be amputated: "Cut it, because I can't do it anymore. . . . I told them, if need to cut it, just cut it. Just cut it. Give me something out of wood or something. I don't want the pain no more." *Id.* at 516. Ortiz also indicated that his ankle had been "turning black and blue" for the last five or six months but had not had it checked by a doctor. *Id.* at 512–14. Ortiz confirmed he had not seen a surgeon in the last six or twelve months at the time, but that he was scheduled to see a foot doctor in the next two weeks. *Id.* at 517.

Based on the December 2010 X-ray, Dr. Kendrick opined that the x-ray showed "relatively mild osteoarthritis. . . . [M]ost people with mild osteoarthritis of the ankle tolerate that fairly well." *Id.* at 519. Dr. Kendrick indicated that the December 2012 X-ray was "very comparable to the one in 2010, the minimal narrowing of the ankle mortar, and – which indicates which is a stage of osteoarthritis, basically, and so they talk about the minimal qualifying post-traumatic degenerative changes in the region, in other words the changes in his ankle are relatively mild and certainly disproportionate to his complaints." *Id.* at 522–23. Dr. Kendrick further opined that "there's nothing in his ankle preventing

him from bearing full weight. . . . [A]s I said, the pain is disproportionate to the findings, but it does have findings that could cause pain. There's no question about that. And the doctor says he has severe left ankle arthrosis, and I don't know what the basis of that is. The X-ray doesn't show severe ankle arthrosis." *Id.* at 524–25.[15]

Dr. Kendrick opined that "discounting his pain . . . he could do probably medium work. With his pain, I guess I testified to light earlier, but I certainly would place him someplace between light and sedentary." *Id.* at 527. Dr. Kendrick testified that Ortiz could walk up to four hours in an eight-hour day and stand for up to 30 minutes at a time with the option to sit for ten minutes. *Id.* at 527–28. When asked what to make of the lack of evidence of muscle atrophy, Dr. Kendrick explained: "Well, it tells you that whatever is causing the pain, he's not restricting the movement and use of the ankle, because it's – the muscles will atrophy very quickly once you stop using the body part." *Id.* at 532. Dr. Kendrick opined that Ortiz should be able to perform with limited standing and walking, but otherwise, he should be able to lift and carry 20 pounds occasionally and ten pounds frequently; he would not be able to squat, but he could kneel and crawl on a frequent basis. *Id.* at 533.

---

[15] "Arthrosis" is defined as "1: an articulation or line of juncture between bones 2: a degenerative disease of a joint." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/arthorsis (last visited September 25, 2019).

The ALJ asked Festa whether any jobs were available for a hypothetical person who was limited to a simple task instruction job and light work, could lift and carry ten pounds frequently and 20 pounds occasionally, was limited to standing and walking a total of four hours in an eight-hour day, had the option to sit for ten minutes after standing for 30 minutes, and could not squat. *Id.* at 534. Festa cited employment as storage facility rental clerk, school bus monitor, and order caller. *Id.* at 535.

## II. DISCUSSION

### A. Legal Standards

#### 1. Judicial Review of Commissioner's Determinations

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual

determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high").

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g).

In certain circumstances, the court may remand a case solely for the calculation of benefits, rather than for further administrative proceedings. "In . . . situations[ ] where this Court has had no apparent basis to conclude that a more

complete record might support the Commissioner's decision, [the court has] opted

simply to remand for a calculation of benefits." *Michaels v. Colvin*, 621 F. App'x 35,

38–39 (2d Cir. 2015) (summary order) (quoting *Rosa v. Callahan*, 168 F.3d 72, 83

(2d Cir. 1999)) (internal quotation marks omitted). The court may remand solely for

the calculation of benefits when "the records provide[ ] persuasive evidence of total

disability that render[s] any further proceedings pointless." *Williams v. Apfel*, 204

F.3d 48, 50 (2d Cir. 1999). However, "[w]hen there are gaps in the administrative

record or the ALJ has applied an improper legal standard, [the court has], on

numerous occasions, remanded to the [Commissioner] for further development of

the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v.

Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

## 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Physical or

mental impairments must be "of such severity that [the claimant] is not only unable

to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the

national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a) Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled[.]" *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. § 404.1520(a)(4). First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is unemployed, at the second step the Commissioner determines whether the claimant has a "severe" impairment restricting her ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is considered disabled. *Id.*; 20 C.F.R. §

404.1520(d).  If not, the Commissioner continues to the fourth step and determines whether the claimant has the residual functional capacity ("RFC") to perform her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work.  20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b)  Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial."  *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted).  As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits."  *Sims*, 530 U.S. at 111.  Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history.  *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§ 404.1512(d)–(f)).  This responsibility "encompasses not only the duty to obtain a

claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)). The ALJ must develop the record even where the claimant has legal counsel. *See, e.g.*, *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Remand is appropriate where this duty is not discharged. *See, e.g.*, *Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c)    Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(c), 416.927(d)) (internal quotation marks omitted).  A treating physician's opinion is given controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1502. Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. § 404.1527(c)(2).

A treating physician's opinion is not always controlling.  For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner.  *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R.

§§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.

1999) ("A treating physician's statement that the claimant is disabled cannot itself

be determinative.").  Additionally, where "the treating physician issued opinions

that [were] not consistent with other substantial evidence in the record, such as the

opinion of other medical experts, the treating physician's opinion is not afforded

controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*

*v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted)

(alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the

treating physician's] opinion is with the record as a whole, the less weight it will be

given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the

Commissioner has an affirmative duty to 'fill any clear gaps in the administrative

record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420

(quoting *Burgess*, 537 F.3d at 129); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d

Cir. 1998) (discussing ALJ's duty to seek additional information from treating

physician if clinical findings are inadequate).  As a result, "the 'treating physician

rule' is inextricably linked to a broader duty to develop the record.  Proper

application of the rule ensures that the claimant's record is comprehensive,

including all relevant treating physician diagnoses and opinions, and requires the

ALJ to explain clearly how these opinions relate to the final determination."

*Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y.

Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust."), *adopted by*

2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry,

the ALJ must consider several factors outlined by the Second Circuit:

> (1) the frequency of examination and the length, nature and extent of
> the treatment relationship; (ii) the evidence in support of the treating
> physician's opinion; (iii) the consistency of the opinion with the record
> as a whole; (iv) whether the opinion is from a specialist; and (v) other
> factors brought to the Social Security Administration's attention that
> tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see also Burgess*, 537 F.3d at 129; 20

C.F.R. § 404.1527(c)(2). "An ALJ's failure to 'explicitly' apply the *Burgess* factors

when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 95–

96 (quoting *Selian*, 708 F.3d at 419–20). If, based on these considerations, the ALJ

declines to give controlling weight to the treating physician's opinion, the ALJ must

nonetheless "comprehensively set forth reasons for the weight" ultimately assigned

to the treating source. *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133

(responsibility of determining weight to be afforded does not "exempt administrative

decisionmakers from their obligation . . . to explain why a treating physician's

opinions are not being credited") (referring to *Schaal*, 134 F.3d at 505 and 20 C.F.R.

§ 404.1527(d)(2)). The regulations require that the SSA "always give good reasons

in [its] notice of determination or decision for the weight" given to the treating

physician. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration

in original) (citations omitted). Indeed, "[c]ourts have not hesitate[d] to remand

[cases] when the Commissioner has not provided good reasons." *Pena ex rel. E.R.*,

2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (second and third alteration in original) (internal quotation marks omitted).

### d) Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints.'" *Id.* (quoting *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). Accordingly, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged.

*Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)). Among the kinds of evidence that the ALJ must consider (in addition to objective medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. [f]actors that precipitate and aggravate the symptoms; 4. [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

## B.     The ALJs' Decisions

### 1.     ALJ Walters's October 28, 2011 Decision

On October 28, 2011, ALJ Walters issued a nine-page decision concluding that Ortiz had not been under a disability within the meaning of the Social Security Act since November 12, 2009, the date the application was purportedly protectively filed. AR at 22. At the first step of the five-step inquiry, the ALJ found that Ortiz had not engaged in substantial gainful activity since May 12, 2010. *Id.* at 24. At the second step, the ALJ found that Ortiz had a severe impairment of status-post

ORIF surgery to the left ankle. *Id.* The ALJ found that his hypertension and asthma conditions, neither of which were alleged in his original disability application, as well as his depression were nonsevere. *Id.* at 24–27. At step three, the ALJ found that Ortiz did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. *Id.* at 27. At step four, the ALJ assessed that Ortiz had a residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 416.967(a). *Id.* In making this finding, the ALJ did not appear to rely on any opinion, dismissing the opinions of nurse practitioner Romeeda Mohammed and Dr. Auricchio. *Id.* at 28. Without further elaboration, the ALJ "instead concluded that while the claimant has had significant problems walking and standing, he could nonetheless undertake the demands of sedentary work, which requires one to stand/walk for no more than a total of 2 hours in a workday." *Id.* at 28–29. The ALJ thereafter found that Ortiz does not have past relevant work. *Id.* at 29. At step five, the ALJ concluded that, considering his age, education, work experience, and residual functional capacity, there were jobs that exist in the national economy that Ortiz could perform. *Id.*

After the Appeals Council denied Ortiz's request of review of ALJ Walters's decision, Ortiz commenced an action in this District to appeal the Commissioner's final decision on October 1, 2012. *Id.* at 568–71. However, the parties shortly thereafter stipulated that the action be remanded for further proceedings, which the Court approved on June 12, 2013. *Id.* at 572. Pursuant to the District Court

remand order, the Appeals Council directed the ALJ to obtain additional evidence in order to complete the administrative record; further consider treating source opinions and, as appropriate, request the treating sources to provide additional evidence and/or further clarification of the opinions; further evaluate Ortiz's mental impairment; further consider Ortiz's maximum residual functional capacity; further evaluate his subjective complaints; obtain evidence from a vocational expert to clarify the effect of the assessed limitations on Ortiz's occupational base; and consolidate his subsequent claims for SSI filed on May 2, 2013 and issue a new decision on the associated claims. *Id.* at 577–80.

### 2. ALJ Grossman's August 29, 2016 Decision

On August 29, 2016, ALJ Grossman issued a 23-page decision concluding that Ortiz had not been under a disability within the meaning of the Social Security Act since November 10, 2009, the date the application was purportedly protectively filed. *Id.* at 403.

At the first step, the ALJ found that Ortiz had not engaged in substantial gainful activity since November 10, 2009. *Id.* at 405. The ALJ noted numerous reports by Ortiz in the record to various providers that he was working as a superintendent, porter, and car parker, which Ortiz denied at the hearing. *Id.* Nevertheless, because there was insufficient documentation to establish earnings at the substantial gainful activity level, the ALJ found in favor of Ortiz at step one. *Id.* at 405–06.

At step two, the ALJ found that Ortiz had severe impairments of osteoarthritis of the left ankle, status-post 2003 ORIF of a fractured tibia and fibula, major depressive order, and generalized anxiety disorder. *Id.*[16] Here, the ALJ also determined that his alleged asthma, high blood pressure, high cholesterol, and lumbar spine condition were nonsevere. *Id.* at 406–07. The ALJ also found that Ortiz's opioid dependence was not considered material to his disability. *Id.* at 407.

At step three, the ALJ found that Ortiz did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. *Id.* at 407. Specifically, the ALJ considered listing 1.02A for the left ankle impairment, which requires involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in the inability to ambulate effectively. *Id.* at 408. According to the ALJ, the evidence of record did not establish that Ortiz has the inability to ambulate effectively. *Id.*

The ALJ found that Ortiz's mental impairments did not meet or medically equal the criteria of listings 12.04 and 12.06. *Id.* In making this finding, the ALJ

---

[16] It is unclear from the record on what ALJ Grossman based his finding of a fractured fibula requiring ORIF surgery. There is no evidence in the record that Ortiz even had an operation on his fibula. Neither Kendrick, who testified in two of the hearings, nor either of the 2010 and the 2012 x-ray reports mention a fractured fibula or any evidence of surgery. AR at 281, 497, 519, 1937. The x-ray ordered approximately a year after the ankle injury stated: "[Ortiz] had [a] fracture of the distal left tibia with internal fixation in the O.R. . . . The distal fibula and lateral malleolus shows no evidence of previous fractures. The previous fractures have healed." *Id.* at 265. Accordingly, both the ORIF and Ortiz's claim of disability relate solely to his fractured tibia from 2013.

considered whether the paragraph B criteria were satisfied, which requires at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation. *Id.* According to the ALJ, Ortiz had mild restriction in activities of daily living, mild difficulties in social function, moderate difficulties with regard to concentration, persistence or pace, and had experienced no episodes of decompensation. *Id.* at 408–10.

The ALJ also considered whether the paragraph C criteria were satisfied. *Id.* at 410. He concluded that the paragraph C criteria for Listing 12.04 were not satisfied because there was no evidence that Ortiz had experienced repeated episodes of decompensation, he was residing in a private apartment at the time, he was able to perform activities of daily living with no to minimal assistance, and there was no evidence of a residual disease process that would be expected to lead to decompensation if a minimal increase in demands or change in environment occurred. *Id.* According to the ALJ, the paragraph C criteria for Listing 12.06 were not met because there was no evidence Ortiz had a complete inability to function independently outside his home. *Id.*

At step four, the ALJ concluded that Ortiz had the residual functional capacity to perform a range of light work as defined in 20 C.F.R. § 406.967(b). *Id.* at 410. Specifically, he found the following: Ortiz was capable of sitting for six hours in an eight-hour workday. *Id.* He could stand or walk for a total of four hours, with

an option to sit for ten minutes after standing or walking for 30 minutes at one time. *Id.* Ortiz could not squat. *Id.* He was limited to simple task/instruction jobs. *Id.* He could understand and carry out instructions; maintain attention and concentration; interact appropriately with supervisors, co-workers, and the public, and keep a regular schedule; all within normal workplace expectations. *Id.*

In making this assessment, the ALJ found that Ortiz's medically determinable impairments "could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 412.

To arrive at this conclusion concerning the ankle impairment, the ALJ reviewed Ortiz's treatment history and weighed the opinions of various medical sources. *Id.* at 412–17. The ALJ accorded "significant" weight to the opinion of non-examining medical expert Dr. Kendrick because he had a specialty in orthopedics; reviewed the entire record; provided a detailed rationale for his opinion; had specialized knowledge of the requirements of the Social Security Act; and because his opinion was consistent with the overall evidence of the record, including the lack of any updated diagnostic testing after 2012. *Id.* at 415. The ALJ accorded "limited" weight to the opinion of examining psychiatrist Dr. McCurtis regarding Ortiz's physical limitations because the opinion was outside the scope of his specialty, inconsistent with the overall evidence of record, and inconsistent with the sporadic course of minimal treatment. *Id.* at 415–16. The ALJ also accorded

"limited" weight to treating podiatrist Dr. Auricchio's opinion because it was inconsistent with the overall evidence of record and inconsistent with the sporadic course of minimal treatment. *Id.* at 416. The ALJ accorded "some" weight to the opinion of consultative internist Dr. Revan because, while the mild limitations she assessed with respect to climbing stairs were generally consistent with the overall evidence of record, the evidence did not substantiate the need for a cane and the evidence supported slightly greater restrictions in walking and standing than a mild restriction. *Id.* at 416–17.

With respect to Ortiz's mental impairment, the ALJ noted that the record contained "minimal and sporadic treatment after the application date." *Id.* at 417. The ALJ proceeded to review the mental health examinations that were in the record and weigh the various medical opinions. *Id.* at 417–21. The ALJ accorded "limited" weight to consultative psychologist Dr. Rubin's opinion because he was not aware of the specific antidepressant medications that Ortiz was taking, his mental status examination revealed relatively minimal objective findings, and his opinions were inconsistent with the overall evidence of record. *Id.* at 419–20. The ALJ accorded "limited" weight to examining psychiatrist Dr. McCurtis's opinions because he found them to be inconsistent with the overall evidence of record. *Id.* at 420. The ALJ accorded "significant" weight to consultative psychologist Dr. Broska's opinion because the opinion, as well as the relatively minimal findings on mental status examination, was generally consistent with the overall evidence of record. *Id.* at 421.

In evaluating the consistency of Ortiz's allegations with the objective evidence of record, the ALJ concluded his allegations of debilitating symptoms were not wholly consistent with the objective evidence of record, particularly Ortiz's description of daily activities and numerous reports that he worked as a superintendent, porter, and car parker. *Id.* at 421–22. The ALJ also considered that the treatment Ortiz received had essentially been routine and conservative in nature. *Id.* at 422.

Noting that Ortiz did not have past relevant work, the ALJ proceeded to step five. *Id.* at 422. The ALJ found that considering his age, education, work experience and residual functional capacity there were jobs that exist in significant numbers in the national economy that Ortiz could perform, specifically: storage rental clerk, school bus monitor, order caller, and office helper. *Id.* at 423.

## C. Analysis

Ortiz argues that the ALJ erred by according less than controlling weight to the opinions of Dr. McCurtis and Dr. Auricchio because they were his treating physicians and thus their opinions were owed deference under the treating physician rule. As discussed below, the ALJ did not violate the treating physician rule as to Dr. McCurtis because he does not qualify as a treating source. While Dr. Auricchio, on the other hand, qualifies as treating physician, the ALJ failed not by according less than controlling weight to Dr. Auricchio's opinion but by doing so without a complete record. Indeed, the ALJ could not have properly weighed Dr. Auricchio's opinion because his treatment notes were indecipherable and his

opinion was rendered before a complete medical history for the relevant period had developed. Therefore, the ALJ's error with respect to Dr. Auricchio lies in his failure to adequately develop the record.

The error in failing to fully develop the record is amplified by the fact that the ALJ, after relegating the opinions of Dr. McCurtis and Dr. Auricchio to ones deserving only limited weight, relied heavily on the opinions of non-treating sources. However, he did so when the record was replete with references to a number of physicians who treated Ortiz for his physical and mental impairments for a period of time but whose opinions were not solicited. Because the ALJ should have solicited the opinions from Ortiz's treating sources, including seeking further clarification from Dr. Auricchio, before turning to (and relying on) the non-treating sources, the case should be remanded for further proceedings.

### 1. The ALJ Did Not Violate the Treating Physician Rule

#### a) Dr. McCurtis

Ortiz argues that the ALJ erred by giving limited weight to the opinions from "treating board-certified psychiatrist Dr. McCurtis." Pl. Mem. at 15. According to the ALJ, Dr. McCurtis's opinions were "inconsistent with the overall evidence of the record, including the relatively minimal and extremely sporadic treatment sought over the relevant period." AR at 420. The Commissioner argues that the ALJ properly declined to give more than limited weight to Dr. McCurtis's opinions because he "provided plaintiff with limited treatment, over a period of less than two months." Def. Mem. at 30. The parties also dispute whether the ALJ, in according

less than controlling weight to Dr. McCurtis's opinion, considered the factors provided in 20 C.F.R. §§ 404.1527, 416.927 to determine how much weight to give the opinion. Pl. Mem. at 17–19; Def. Mem. at 31–32.

Under the treating physician rule, the opinions of a claimant's treating physician are entitled to a degree of deference, and the ALJ is "required to give . . . controlling weight [to such opinions] or to provide good reasons for discounting them." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)). However, the treating physician rule is inapplicable where there is no "ongoing physician-treatment relationship" that places the doctor "'in a unique position to make a complete and accurate diagnosis.'" *Monette v. Astrue*, 269 F. App'x 109, 113 (2d Cir. 2008) (summary order) (quoting *Amone v. Bowen*, 882 F.2d 34, 41 (2d Cir. 1989)). Here, Dr. McCurtis evaluated Ortiz on only two occasions— April 4, 2011 and May 23, 2011—and thus did not have an ongoing treatment relationship with him for purposes of the treating source rule. *See Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) (treating sources who see a patient only once or twice do not have a chance to develop an ongoing relationship with the patient and thus are generally not considered treating physicians); *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988) (defining a "treating physician" as a physician "who has or had an ongoing treatment and physician-patient relationship with the individual").

The Second Circuit has held that a physician's opinion is entitled to less weight when the physician did not treat the claimant on an ongoing basis. In

*Mongeur*, the court emphasized that the opinion of a treating physician is given extra weight because of his unique position resulting from the "continuity of treatment he provides and the doctor/patient relationship he develops." 722 F.2d at 1039 n.2. By contrast, the court reasoned that a physician who examined a claimant only "once or twice" did not see the claimant regularly and thus did not develop a physician/patient relationship with him. *Id.* The Second Circuit concluded that such a physician's medical opinion was "not entitled to the extra weight of that of a 'treating physician.'" *Id.*; *see also* 20 C.F.R. § 404.1527(c)(2) (ALJ should generally "give more weight to" opinion of doctor who treated a claimant on an ongoing basis and thus could provide a "detailed, longitudinal picture of [the claimant's] medical impairment(s)," offering a more "unique perspective to the medical evidence" than provided by reports from "individual examinations, such as consultative examinations or brief hospitalizations").

Especially when a mental health impairment is involved, as it is here, the "assessment of functional limitations" requires a "longitudinal picture of [the claimant's] overall degree of functional limitation," 20 C.F.R. § 404.1520a(c)(1), because mental disabilities "are best diagnosed over time." *Olejniczak v. Colvin*, 180 F. Supp. 3d 224, 228 (W.D.N.Y. 2016). Given that Dr. McCurtis examined Ortiz for his mental impairments on only two occasions spanning two months in the first year of the relevant six-year period, the ALJ did not err in giving less than controlling weight to his opinions. *See*, *e.g.*, *Sanchez v. Berryhill*, No. 16-CV-7775 (PGG) (DF), 2018 WL 1472687, at *18 (S.D.N.Y. Feb. 28, 2018) ("Dr. McCurtis's two

documented meetings with Plaintiff do not constitute an 'ongoing treatment relationship,' and cannot substantiate Plaintiff's claim to the contrary.") (citing 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)), *adopted by* 2018 WL 1478040 (S.D.N.Y. Mar. 23, 2018).

Even if Dr. McCurtis qualified as a treating source, consideration under the various factors—(1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the relevant evidence supporting the opinion, (4) the consistency of the opinion with the record as a whole, and (5) whether the physician is a specialist—would unlikely be favorable, given, among other reasons, that Dr. McCurtis's April 2011 opinions were rendered on the first day that Ortiz presented to him, his May 2011 opinion was generated on the second visit, and there is no evidence of other visits beyond these two. While the Court is mindful that Dr. McCurtis did, in fact, examine Ortiz and prescribe Cymbalta, the record contains no treatment or therapy notes substantiating his opinions, and Ortiz never signaled to the ALJ or the Court that he saw Dr. McCurtis outside of these two visits. Therefore, Dr. McCurtis's opinion, even if deemed one of a treating psychiatrist, would unlikely have been entitled to controlling weight. The Court need not consider whether the ALJ provided good reasons before giving a treating psychiatrist's opinion less than controlling weight because Dr. McCurtis's opinion does not qualify for treating-source deference.[17]

---

[17] Ortiz also argues that the symptoms identified by Dr. McCurtis "are the gold standard for evaluating the severity of an individual's impairments." Pl. Mem. at 15 (citing 20 C.F.R. § 416.928). There is no question that "[m]edically acceptable

### b) Dr. Auricchio

Ortiz also argues that that the ALJ erred by giving limited weight to the opinions from "treating podiatrist Dr. Auricchio." Pl. Mem. at 19. The Commissioner reiterated the ALJ's reasons for according less than controlling

---

clinical and laboratory diagnostic techniques include consideration of a patient's report of complaints, or history, as an essential diagnostic tool." *Burgess*, 537 F.3d at 128 (alterations omitted) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003)); *see also Showers v. Colvin*, No. 13-CV-1147 (GLS), 2015 WL 1383819, at *8 n.18 (N.D.N.Y. Mar. 25, 2015) ("It is axiomatic that a treating psychiatrist must consider a patient's subjective complaints in order to diagnose a mental disorder." (quoting *Santana v. Astrue*, No. 12-CV-815 (BMC), 2013 WL 1232461, at *14 (E.D.N.Y. Mar. 25, 2013))). "This is especially true for diagnoses of mental disorders because unlike orthopedists, for example, who can formulate medical opinions based upon objective findings derived from objective clinical tests, scans or x-rays, a psychiatrist typically treats the patient's subjective symptoms or complaints about those symptoms." *Santana*, 2013 WL 1232461, at *14. This axiom, however, does not automatically require assigning controlling weight to Dr. McCurtis's opinion.

In addition, Ortiz contends that the ALJ "failed to consider the likely possibility that [he] is one of many individuals 'who suffers from psychological and emotional difficulties . . . [but] lack[s] the rationale to decide appropriate treatment measures.'" Pl. Mem. at 18 (citing *Thompson v. Apfel*, No. 97-CV-7697 (JCF), 1998 WL 720676, at *6 (S.D.N.Y. Oct. 9, 1998). There is no evidence in the record that this was true of Ortiz. In fact, the record is replete with documentation that he was motivated for treatment. In any event, "[i]t is precisely this grey area, whether [his] disability caused these inconsistencies [in behavior or treatment], or whether these inconsistencies are the very evidence of [his] lack disability—that is the underlying rationale for the regulation's requirement that an ALJ employ a medical advisor's assistance in determining onset dates for degenerative disability cases." *Proano v. Colvin*, No. 12-CV-4184 (FB), 2013 WL 5566105, at *4 (E.D.N.Y. Oct. 9, 213) (citing S.S.R. 83–20, 1983 WL 31249, at *1). To the extent that the ALJ improperly drew "inferences about [Ortiz's] symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment," S.S.R. 96–7p, 1996 WL 374186, at *7, this can be remedied on remand.

weight to the opinion of Dr. Auricchio, which, according to the ALJ, was inconsistent with the overall evidence of record, specifically the minimal X-ray and physical examination findings and the sporadic course of treatment. Def. Mem. at 27–28.

Suggesting that Dr. Auricchio should not be considered a treating physician, the Commissioner argues that "the opinion of a podiatrist who saw plaintiff a few times" may be overridden by "the opinion of a testifying orthopedic surgeon, or an examining medical doctor." *Id.* at 29. As noted in the discussion about Dr. McCurtis, "a physician who has examined a claimant on one or two occasions is [generally] not considered a treating physician." *Marte v. Berryhill*, No. 17-CV-3567 (VSB) (JLC), 2018 WL 2979475, at *16 (S.D.N.Y. June 14, 2018) (citing 20 C.F.R. § 404.1527(a)(2)), *adopted by*, 2018 WL 5255170 (S.D.N.Y. Oct. 22, 2018). "However, there is no minimum number of visits or period of treatment by a physician before this standard is met." *Id.* (citing 20 C.F.R. § 404.1527(a)(2)).[18] "Courts have held that SSA adjudicators should focus on the nature of the ongoing physician-treatment relationship, rather than its length." *Id.* (quoting *Vasquez v. Colvin*, No. 14-CV-7194 (JLC), 2015 WL 4399685, at *20 (S.D.N.Y. July 20, 2015)).

On September 1, 2010, Ortiz began seeing Dr. Auricchio, who treated Ortiz at least four times over a year. AR at 312, 314–15, 1768. Dr. Auricchio examined Ortiz, diagnosed equinus, arthritis, and severe limitation of motion, reviewed

---

[18] This standard, of course, applies to all health providers, including Dr. McCurtis; however, as discussed *supra*, one or two visits can hardly be indicative of Ortiz's longitudinal mental health.

diagnostic testing, reviewed treatment options, prescribed an ankle brace and walker, and scheduled follow-up appointments for further treatment. *Id.* at 276, 312, 314–15, 852–59, 1768. Only two months after Ortiz's fourth appointment, Dr. Auricchio completed an impairment questionnaire. *Id.* at 372–79. The ALJ therefore ought to have evaluated Dr. Auricchio's opinion as that of a treating physician.

Other decisions have inferred a treating relationship in similar circumstances. In *Nunez v. Berryhill*, for example, a physician who met with the claimant three times over the course of three months was considered a treating source. No. 16-CV-5078 (HBP), 2017 WL 3495213, at *24 (S.D.N.Y. Aug. 11, 2017). There, the doctor "wrote an EMG report[;]" "referred plaintiff for the EMG[;]" "noted plaintiff's medical history and the results of the EMG and a physical examination[;]" "diagnosed plaintiff[;] and "prescribed medication[.]" *Id.* In *Vasquez*, a doctor who met with the claimant three times was considered a treating physician where he "referred Vasquez to other specialists for further treatment and testing," "wrote a brief note confirming [claimant's] impairments[,]" and was referred to by the claiming as his treating physician. 2015 WL 4399685, at *20. In *Harrison v. Secretary of Health & Human Services*, a physician who had seen plaintiff at least four times was considered a treating source where she "diagnosed plaintiff and referred her for various tests and treatment." 901 F. Supp. 749, 755 (S.D.N.Y. 1995); *see also Snell,* 177 F.3d at 130 (treating relationship found where doctor met with claimant at least three times); *Vargas v. Sullivan*, 898 F.2d 293,

294 (2d Cir. 1990) (applying treating physician rule where doctor saw plaintiff for only three months).

Because the record indicates that he evaluated Ortiz, had an ongoing relationship with him, and provided him with treatment, Dr. Auricchio, unlike Dr. McCurtis, qualifies as a treating source. Notwithstanding Dr. Auricchio's treating relationship with Ortiz, the ALJ assigned his opinions limited weight, finding that they were inconsistent with the record. AR at 416. However, as a result of the ALJ's error of drawing conclusions based on an unclear record, the Court is unable to determine whether the ALJ violated the treating physician's rule as to Dr. Auricchio.[19]

### 2. The ALJ Did Not Fully Develop the Record at Step Four

The Court cannot assess whether the ALJ's weighing of Dr. Auricchio's opinions was legal error because the ALJ did not fulfill his duty to clarify these opinions, which is error in and of itself. This failure to develop the record is also manifested in the ALJ's decision to rely heavily on the opinions of consultative examiners and a non-examining medical expert without first attempting to acquire medical opinions from the numerous treating physicians identified in the record. Therefore, the case must be remanded to develop a clear and complete record upon which the ALJ can make a supported RFC determination.

---

[19] The parties also dispute whether Dr. Auricchio is an acceptable medical source. Def. Mem. at 28–29; Pl. Reply at 1; Def. Reply at 1. Because remand is warranted by the ALJ's failure to develop the record, the Court will not address this issue at this time. The ALJ should consider it on remand.

### a) The ALJ Failed to Clarify Dr. Auricchio's Treatment Notes

The Court has reviewed the administrative record and attempted to decipher Dr. Auricchio's treatment notes, all of which are completely handwritten. AR at 312, 314–15, 372–79, 1768. Based on this review, the Court is forced to conclude— and Ortiz concedes—that virtually each of the doctor's four sets of treatment notes is illegible, thereby depriving the ALJ (and the Court) of his impressions and observations about Ortiz's medical condition. Pl. Mem. at 2. The Court is therefore unable to determine whether the ALJ's main reason for discounting his opinion— inconsistency with the record—is supported by substantial evidence. The Court is unclear how the ALJ could have found that Dr. Auricchio's opinions were inconsistent with the record when the notes themselves are illegible. Accordingly, the Court finds that remand for clarification of Dr. Auricchio's treatment notes is required. *See Connor v. Barnhart*, No. 02-CV-2156 (DC), 2003 WL 21976404, at *8 (S.D.N.Y. Aug. 18, 2003) ("[C]ourts have held that illegibility of important medical records is a factor warranting a remand for clarification and supplementation.") (quoting *Vaughn v. Apfel*, No. 98-CV-25 (HB), 1998 WL 856106, at *7 (S.D.N.Y. Dec. 10, 1998)).

Generally, the Commissioner must give controlling weight to the opinion of a treating physician if the opinion is well supported by medically acceptable clinical and diagnostic techniques and not inconsistent with other substantial evidence in the record, such as the opinions of other medical experts. *See Halloran*, 362 F.3d at 32. However, the "Second Circuit has made clear . . . that an ALJ cannot simply

discount a treating physician's opinion based on a lack of clinical findings that accompany that opinion. Rather, the ALJ has an affirmative duty to develop the record and seek additional information from the treating physician, *sua sponte*, even if plaintiff is represented by counsel." *Pulvino v. Berryhill*, No. 17-CV-6507 (JWF), 2018 WL 3575315, at *3 (W.D.N.Y. July 14, 2018) (internal citations omitted).

"The failure to gather [legible copies of Dr. Auricchio's treatment notes] is especially problematic in light of the fact that he was a treating physician whose opinion must be given special evidentiary weight." *Seltzer v. Comm'r of Soc. Sec.*, No. 07-CV-235 (CBA), 2007 WL 4561120, at *10 (E.D.N.Y. Dec. 18, 2007). Before discounting Dr. Auricchio's opinion, the ALJ should have obtained "more detailed and clearer statements from [his] treating physician[], especially since the medical records which appear in the administrative record are often illegible." *Miller v. Barnhart*, No. 03-CV-2072 (MBM), 2004 WL 2434972, at *9 (S.D.N.Y. Nov. 1, 2004) (citation and quotation marks omitted). "There is no way for this court to determine whether the illegible information in these reports might have provided further support for [Ortiz's] claim." *Id.*

Often, the most effective method of seeking additional information is by recontacting the treating physician regarding his or her incomplete opinion.[20] On

[20] Previously, the SSA's regulations required the ALJ to first recontact the treating physician when additional evidence was required. *See* 20 C.F.R. § 404.1512(e)(1) (2011) ("We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available."). However, the regulations were amended in 2012 to give the ALJ more

remand, the ALJ is directed to recontact Dr. Auricchio and clarify the basis for his

opinion. The ALJ should request legible copies of Dr. Auricchio's treatment notes,

or an explanation of the findings contained therein. The ALJ is also directed to

seek out any additional medical records, to the extent they exist, regarding any

additional objective results upon which Dr. Auricchio relied in forming his opinion.

After such clarification is obtained, the ALJ is directed to properly consider Dr.

Auricchio's opinion in light of the treating physician rule. *See* 20 C.F.R. §

416.927(c)(2).

---

flexibility in determining how best to obtain additional information. *See* How We
Collect and Consider Evidence of Disability, 77 FR 10651-01, at 10651. The
regulations now provide that recontacting the treating physician is one option for
obtaining additional evidence. *See* 20 C.F.R. § 404.1520b(b)(2)(i) (2017) ("We may
recontact your medical source.").

While this amendment has given the ALJ greater flexibility in determining how to
obtain additional information, it has not eliminated the ALJ's obligation to develop
the record when additional information is needed due to the vagueness,
incompleteness, or inconsistency of the treating source's opinion. *See Gabrielsen v.
Colvin*, No. 12-CV-5694 (KMK), 2015 WL 4597548, at *6 (S.D.N.Y. July 30,
2015) ("Nonetheless, courts in the Second Circuit have concluded, citing these
regulations, that the ALJ still has an obligation to re-contact the treating physician
in some cases. . . . Accordingly, the change in the regulations does not mean that
the ALJ here had no duty to re-contact the treating physician."); *Nunez*, 2017 WL
3495213, at *16 ("[T]he current amended regulations . . . give the ALJ more
discretion to determine the best way to resolve the inconsistency or insufficiency
based on the facts of the case. . . . However, the regulations continue to contemplate
the ALJ recontacting treating physicians where the additional information needed
is directly related to that source's medical opinions." (alterations in original)
(internal quotation marks and citations omitted)). The SSA acknowledges that, in
many cases, recontacting the treating physician will still be the most effective and
efficient means of obtaining additional information. *See* 77 FR 10651-01, at
10652 ("In fact, we expect that adjudicators will often contact a person's medical
source(s) first whenever the additional information sought pertains to findings,
treatment, and functional capacity, because the treating source may be the best
source regarding these issues.").

To be sure, Dr. Auricchio's opinion, which accounted for approximately a year of the relevant six-year period, was rendered approximately four years before the hearing and five years before the ALJ issued his August 29, 2016 decision. The timeliness of evidence is also a factor that may weigh against according more weight to a medical opinion. "This is particularly true where the stale evidence relates to an RFC assessment that was completed before a full medical history was developed." *Acevedo v. Astrue*, No. 11-CV-8853 (JMF) (JLC), 2012 WL 4377323, at *16 (S.D.N.Y. Sept. 4, 2012), *adopted by* 2012 WL 4376296 (Sept. 24, 2012). *See, e.g., Suarez v. Comm'r of Soc. Sec.*, No. 09-CV-338 (SLT), 2010 WL 3322536, at *8 (E.D.N.Y. Aug. 20, 2010) ("[B]ecause Dr. Weiss's opinion is both outdated and inconsistent with Dr. Misra's more recent findings, the propositions which the ALJ relied on Dr. Weiss's opinion for when determining Plaintiff's RFC should not have been afforded substantial weight without further explanation."); *Pierce v. Astrue,* No. 09-CV-0813 (GTS) (VEB), 2010 WL 6184871, at *9 (N.D.N.Y. July 26, 2010) ("Because the ALJ's RFC determination was so heavily based upon Dr. Scerpella's August 2005 assessment, it is flawed for the reasons stated above, namely, because the record contains sufficient evidence to question whether that assessment was rendered stale by subsequent events."), *adopted by* 2011 WL 940342 (N.D.N.Y. Mar. 16, 2011). It is certainly possible then that the ALJ could discount Dr. Aurrichio's opinion because it may have been rendered stale. However, that is an assessment the ALJ must make in consideration of the applicable factors and based on a clear and complete record.

### b) The ALJ Failed to Request Medical Source Statements From Other Treating Physicians

A more significant basis for remand is that the ALJ did not satisfy his duty to develop the record by failing to request medical source statements from Ortiz's other treating physicians before relying heavily on non-treating sources.

As noted above, the ALJ has an affirmative duty to develop the record.  *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.").  Where the record contains a treating physician opinion, but the opinion is incomplete, unclear, or inconsistent, the ALJ's duty to develop the record requires the ALJ to seek additional information.  *See Selian*, 708 F.3d at 421 (ALJ should have recontacted physician where physician's opinion was "remarkably vague"); *Schaal*, 134 F.3d at 505; *Cammy v. Colvin*, No. 12-CV-5810 (KAM), 2015 WL 6029187, at *16 (E.D.N.Y. Oct. 15, 2015); *Ashley v. Comm'r of Soc. Sec.*, No. 14-CV-40 (TJM), 2014 WL 7409594, at *3–4 (N.D.N.Y. Dec. 30, 2014).  Therefore, the ALJ should have attempted to obtain opinions from the treating physicians in the record as to the limiting effects of Ortiz's physical and mental impairments during the relevant period, and there is nothing in the record to indicate that he did so. *See, e.g., Ayer v. Astrue*, No. 11-CV-83 (JMC), 2012 WL 381784, at *6 (D. Vt. Feb. 6, 2012) ("Because the ALJ failed to seek an opinion as to Ayer's disability from her treating sources before relying on the opinions of non-treating, non-examining sources, the record was improperly developed.").

Here, Drs. Pierce and Sardar, and arguably Dr. Fruitman, were in a unique position to assess the severity and limiting effects of Ortiz's symptoms, given that each provider treated Ortiz regularly over a sufficiently long period of time.[21]  For example, Ortiz had been under Dr. Pierce's care for almost four years.  AR at 321–29, 339–41, 874–79, 881–912, 1690–1706, 1710, 1832–35.  Likewise, he had been under Dr. Sardar's care for nearly a year.  *Id.* at 915–24, 1603, 1738–42.  Dr. Sardar, in particular, repeatedly treated Ortiz with injections for his ankle pain, which is the condition he claimed most impaired him during the hearing before the ALJ.  *Id.* at 499, 915–24, 1603, 1738–42.  In fact, in discussing the relevant medical evidence in the record, the ALJ's decision makes frequent and extensive references to Drs. Pierce and Sardar's treatment of Ortiz.  *Id.* at 413–14.  As such, even the ALJ appears to tacitly acknowledge the importance of considering their assessment of Ortiz, and yet he failed to do so.  Likewise, Dr. Fruitman indicated that Ortiz received mental health treatment from him and his team for approximately a year and invited any request for documentation, *id.* at 1082, although no such request appears to have been made.

The only other opinion evidence in the record provides a further indication that the medical opinions of Ortiz's other treating physicians should have been solicited and considered prior to the ALJ making his decision.  As noted above, Dr.

---

[21] It does not appear (though it is not entirely clear) from the record that Dr. Fruitman, anyone on his psychiatric team, or *any* mental health provider for that matter, personally examined Ortiz more than once or twice.  Nor has Ortiz identified a mental health provider who treated him over a sufficiently long period.

Auricchio—the only treating physician that the ALJ did consider but whose treatment notes were so difficult to read that they could hardly provide an adequate basis for his assessment—had seen Ortiz on four occasions over the course of the first year of the relevant six-year period. Dr. McCurtis had seen Ortiz on only two occasions over a two-month period, also in the first year of the relevant six-year period. The consultative assessments by Drs. Revan, Broska, and Rubin were based solely on a single examination. Dr. Kendrick did not meet Ortiz at all and instead provided his opinion based on a review of medical evidence in the record. None of these doctors could have provided an opinion containing the same "detailed, longitudinal picture of [Ortiz's] medical impairment[s]" as his treating physicians. 20 C.F.R. § 404.1527(c)(2).

The ALJ's failure to obtain medical opinions from Drs. Pierce and Sardar (and potentially Dr. Fruitman), Ortiz's other treating physicians, as well as clarification of treatment notes from Dr. Auricchio, is reversible error. *See*, *e.g.*, *Downes v. Colvin*, No. 14-CV-7147 (JLC), 2015 WL 4481088, at *12 (S.D.N.Y. July 12, 2015) (remand ordered where ALJ failed to develop "complete and full evidentiary record" because ALJ did not "attempt to obtain the opinions of [claimant's] two treating physicians . . . as to the limitations that [claimant's impairment] imposed on his work-related capabilities").

### c)  The Record Was Not Sufficiently Comprehensive for the ALJ to Make an RFC Determination at Step Four

As noted above, the medical opinions relied upon by the ALJ provided an insufficient record upon which to assess Ortiz's RFC at step four of the disability analysis.

The RFC determination is an adjudicator's finding of "the most [a claimant] can still do [in a work setting] despite [his] limitations." 20 C.F.R. § 404.1545(a); *see also* S.S.R. 96–5p, 1996 WL 374183 (July 2, 1996). An ALJ considers medical source statements and all other evidence in the case record in making an RFC finding. *Id.* A medical source statement is an evaluation from a treating physician or consultative examiner of "what an individual can still do despite a severe impairment, in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis." *Id.* It is an ALJ's responsibility to "develop [the claimant's] complete medical history, including arranging for a consultative examination if necessary, and mak[e] every reasonable effort to help[the claimant] get medical opinions from [his] own medical sources." 20 C.F.R. § 404.1545(a)(3) (citing 20 C.F.R. § 404.1512(d–e)). "In light of the special evidentiary weight given to the opinion of the treating physician . . . the ALJ must 'make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of the treating physician as to the existence, the nature, and the severity of the claimed disability.'" *Molina v. Barnhart*, No. 04-CV-3201 (GEL), 2005 WL 2035959, at *6 (S.D.N.Y. Aug. 17, 2005) (quoting *Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991)).

Nevertheless, "[t]he Second Circuit has held that an ALJ's failure to obtain a medical source statement from a treating physician before making a disability determination is not necessarily an error requiring remand." *Hooper v. Colvin*, 199 F. Supp. 3d 796, 814 (S.D.N.Y. 2016) (citing *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order)). "The inquiry into the need for a treating physician's opinion hinges on the 'circumstances of the particular case, the comprehensiveness of the administrative record,' and 'whether . . . [the record,] although lacking the opinion of [the] treating physician, was sufficiently comprehensive to permit an informed finding by the ALJ.'" *Id.* (quoting *Sanchez v. Colvin*, No. 13-CV-6303 (PAE), 2015 WL 736102, at *5–6 (S.D.N.Y. Feb. 20, 2015)).

In *Tankisi*, the Second Circuit found that despite the lack of a formal opinion about the claimant's RFC from a treating physician, a "voluminous" medical record provided the ALJ with sufficient information to make an informed finding about the claimed disability. *Tankisi*, 521 F. App'x at 34. The record included an informal assessment of the claimant's limitations from a treating physician, opinions from at least two consulting physicians, and an assessment from a state disability examiner. *Id.* at 34. Courts have distinguished *Tankisi*, and remanded where the medical record available to the ALJ was not "robust" enough to obviate the need for a treating physician's opinion. *Sanchez*, 2015 WL at 736102, at *7; *see also Sigmen v. Colvin*, No. 13-CV-268 (DRH), 2015 WL 5944254, at *5 (E.D.N.Y. Oct. 13, 2015) (noting that *Tankisi* and *Swiantek* do not necessarily "preclude remand where an ALJ fails to request an opinion").

In *Downes*, this Court found that although the evidentiary record contained treatment notes, test results, and "direct assessments of [the claimant's] functional capacities" from consultative physicians, the ALJ could not have made an informed determination without the treating physicians' medical opinions. 2015 WL 4481088, at *15. Similarly, in *Sanchez*, even though the record included at least two consulting physicians' opinions, the record was a "far cry from that in *Tankisi* and similar cases, which have excused the ALJ's failure to seek a treating physician opinion based on the completeness and comprehensiveness of the record." 2015 WL 736102, at *6. Indeed, the *Sanchez* court observed that the "failure to obtain the treating psychiatrist's opinion was a gaping hole" in the record. *Id.* at *7. *See also Moreira v. Colvin¸* No. 13-CV-4850 (JGK), 2014 WL 4634296, at *7 (S.D.N.Y. Sept. 15, 2014) (remanding where the ALJ failed to resolve "gaps and inconsistencies" in the medical record and heavily relied on a consultative examiner's report rather than seeking a treating physician's opinion).

It is true that ALJ Grossman did obtain extensive medical evidence in this case, including opinion evidence, and considered a substantial amount of evidence in his decision. However, the record did not contain a useful assessment of Ortiz's limitations from a single treating physician. Under these circumstances, there is an "obvious" gap in the record that must be filled in order for a fair and complete assessment of Ortiz's RFC to take place. *Hooper*, 199 F. Supp. 3d at 816 ("Although the record is extensive, the absence of any up-to-date medical opinion assessing [claimant's] [] functional limitations remains an 'obvious gap' [requiring remand.]")

(quoting *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (summary order)); *Downes*, 2015 WL 4481088, at *11 ("[U]nless 'there are no obvious gaps in the administrative record and the ALJ already possesses a complete medical history,' remand is necessary where the ALJ did not attempt to obtain opinions from the claimant's treating physicians to accompany primary source records.") (quoting *Rosa*, 168 F.3d at 79 n.5); *Aceto v. Comm'r of Soc. Sec.*, No. 08-CV-169 (FJS), 2012 WL 5876640, at *16 (N.D.N.Y Nov. 20, 2012) ("Since the ALJ had nothing more than treatment records and consultative reports to review, he had an affirmative duty to develop the record and request that Plaintiff's treating physicians assess her RFC.").

### d)      The ALJ Should Obtain Physical Therapy Records

In addition, throughout his testimony and in his records from multiple treating physicians, Ortiz consistently cited to his physical therapy sessions. During his 2011 hearing before ALJ Walters, for example, Ortiz testified that he was undergoing physical therapy.  AR at 43–44.  In his visits to Dr. Sardar, Ortiz also reported that physical therapy was helping.  *Id.* at 915–24, 1603, 1737–42. However, while the record contains several "doctor's notes" from 2011 excusing Ortiz's absence due to his physical therapy appointments, it is completely devoid of progress notes from a physical therapist.  *Id.* at 275, 351–56.  A screenshot showing a partial list of physical therapy appointments, some kept while others indicate no shows and cancellations, leaves much to be desired.  *Id.* at 279.  In *Rosa*, the Second Circuit found that the ALJ committed legal error by failing to seek additional

information from a physical therapist who saw the claimant "on a regular basis over a significant period of time." 168 F.3d at 80. Consistent with *Rosa*, upon remand, the ALJ should seek out Ortiz's physical therapy records.

### e) The ALJ Should Clarify the Relevant Disability Period

The Court has been assuming for purposes of its analysis that the period at issue extends from May 12, 2010, the amended onset date, until August 29, 2016, the date of ALJ Grossman's decision. *See* 20 C.F.R. §§ 416.330, 404.335. In reviewing the administrative record, however, the Court encountered medical records from Ulster Correctional Facility beginning around July 5, 2012 through September 4, 2012. AR at 1612–40. As Ortiz's counsel recognized by amending the alleged onset date, an individual is not eligible for SSI benefits while incarcerated. *Id.* at 48. In relevant part, the Social Security Act provides that "no monthly benefits shall be paid . . . to any individual for any month . . . throughout all of which such individual (i) is confined in a jail, prison, or other penal institution or correctional facility pursuant to his conviction of a criminal offense. *See* 42 U.S.C. § 402(x)(1)(A). The suspended benefits are resumed "effective with the earliest day of the month in which a recipient is no longer a resident of a public institution." 20 C.F.R. § 416.1325. In light of Ortiz's apparent incarceration, on remand, the ALJ should clarify the relevant disability period.

### 3. The ALJ Should Reexamine His Credibility Evaluation on Remand

Ortiz argues that the ALJ failed to properly evaluate his credibility. Pl. Mem. at 22–25. The Commissioner counters that the ALJ appropriately found

Ortiz's statements about the intensity, persistence, and limiting effects of his symptoms were not credible. Def. Mem. at 33–35. Because the Court concludes that the ALJ did not adequately develop the record and remands on that basis, the Court need not consider the ALJ's determination that Ortiz's "allegations of debilitating symptoms are not wholly consistent with the objective evidence of record." AR at 421. Instead, it directs the ALJ to reevaluate Ortiz's credibility on remand.

### 4. The ALJ Must Resolve Ortiz's Claim Within 120 Days

The final matter the Court must address is the question of delay. Ortiz applied for benefits in 2010, nearly ten years ago. As courts have acknowledged, disability determinations are "often painfully slow" and "a remand for further evidentiary proceedings (and the possibility of further appeal) could result in substantial, additional delay." *Michaels v. Colvin*, 621 F. App'x 35, 41 (2d Cir. 2015) (summary order) (quoting *Butts*, 388 F.3d at 387). Understanding the continued hardship faced by the claimant, courts have seen fit to impose deadlines on the Commissioner to make final decisions. *See*, *e.g.*, *Michaels*, 621 F. App'x at 41 (120 days to finish further proceedings); *Urena v. Berryhill*, No. 18-CV-3645 (JLC), 2019 WL 1748131, at *16 (S.D.N.Y Apr. 19, 2019) (120 days to finish further proceedings); *Morales v. Berryhill*, No. 17-CV-9315 (JLC), 2018 WL 6381049, at *26 (S.D.N.Y. Dec. 6, 2018) (120 days to finish further proceedings).

Mindful of Ortiz's understandable frustration with the protracted administrative process, this Court will also impose a deadline such that the ALJ

must complete all further administrative proceedings within 120 days of the date of this Opinion and Order. This deadline is additionally necessary in light of the "egregious" delay that Ortiz has experienced. *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 355 (E.D.N.Y. 2010). While the Court is aware of the agency's extraordinarily heavy docket, it took almost two years for the Appeals Council to deny Ortiz's request for review of the ALJ's 2016 decision.

Unlike in 2016, in a new decision in 2019 or 2020, Ortiz will have changed age categories since he first applied in 2010. 20 C.F.R. § 404.1563. In the aforementioned cases where courts have imposed deadlines after acknowledging long delays, the claimants had applied for benefits five to eight years prior to the courts' decisions. *See*, *e.g.*, *Urena*, 2019 WL 1748131, at *16 (eight years); *Michaels*, 621 F. App'x at 41 (eight years); *Cruz v. Colvin*, No. 15-CV-1463 (AJP), 2015 WL 5813158, at *4 (S.D.N.Y. Oct. 6, 2015) (six years); *Turkus v. Astrue*, No. 11-CV-3887 (FB), 2012 WL 3877617, at *5 (E.D.N.Y. Sept. 12, 2012) (six years). Ortiz's wait of nearly ten years makes the imposition of a deadline all the more imperative.

Finally, if upon remand the ALJ denies Ortiz's claim, the Commissioner must issue a final decision within 60 days of any appeal from that denial. If the Commissioner does not adhere to the deadlines set forth herein, and any delay is not attributable to Ortiz, a calculation of benefits owed to Ortiz must be made immediately. *See*, *e.g.*, *Urena*, 2019 WL 1748131, at *16 (imposing same deadlines and conditions); *Gonzalez-Cruz v. Comm'r of Soc. Sec.*, No. 16-CV-6613P (MWP),

2018 WL 3151656, at *3 (W.D.N.Y. June 27, 2018) (same); *Turkus*, 2012 WL 3877617, at *3 (same).

## III.    CONCLUSION

For the foregoing reasons, Ortiz's motion for judgment on the pleadings is granted, the Commissioner's cross-motion is denied, and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the ALJ is instructed to take the following actions:

(1) clarify the dates of the adjudicated disability period;

(2) obtain further clarification from Dr. Auricchio concerning his treatment notes or other bases for his opinion and evaluate his opinion as that of a treating physician (or determine that he is not qualified to be considered one);

(3) fully develop the evidentiary record by soliciting function-by-function assessments or similar testimony from Drs. Fruitman, Pierce, and Sardar in order to address Ortiz's functional limitations;

(4) assess the weight that should be given to the opinions of Ortiz's treating physicians upon a complete record and state explicitly what weight is being given to them;

(5) provide a comprehensive analysis as to why less than controlling weight is afforded to the opinions of Ortiz's treating physicians, if they are not deemed controlling, based on all of the factors outlined in the applicable regulations;

(6) consider and weigh all of the medical opinion evidence in the record with respect to the nature and severity of Ortiz's impairments in order to properly assess whether Ortiz has been under a disability during the relevant period;

(7) to the extent possible, obtain physical therapy records during the relevant period;

(8) hold a new hearing at which the ALJ shall complete the necessary five-step analysis to determine Ortiz's eligibility for benefits;

(9) reevaluate Ortiz's credibility based on further development of the record; and

(10) render a decision within 120 days of the date of this Opinion and Order.

The Clerk is respectfully directed to close Docket Numbers 15 and 22, and enter judgment granting Ortiz's motion, denying the Commissioner's cross-motion, and remanding for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**SO ORDERED.**

Date:  September 25, 2019
       New York, New York

_____
JAMES L. COTT
United States Magistrate Judge